IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| WOSSEN ASSAYE, | ) |
| | ) |
| Movant, | ) |
| | ) No. 1:17-cv-1385 (LMB) |
| v. | ) Crim. No. 1:15-cr-115 (LMB) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent. | ) |

## MEMORANDUM OPINION

Before the Court is movant pro se Wossen Assaye's ("movant" or "Assaye") Motion to

Vacate, Set Aside or Correct Sentence ("Motion to Vacate") under 28 U.S.C. § 2255, in which

he argues that his convictions and sentence should be vacated due to the purported ineffective

assistance of his trial and appellate counsel in connection with his 2015 guilty plea to two counts

of using, carrying, and brandishing a firearm during and in relation to a crime of violence, in

violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2. For the reasons stated below, Assaye's Motion

to Vacate will be dismissed.

I.

On March 25, 2015, Assaye was arrested and detained pursuant to a criminal complaint

which charged him with robbery of the Apple Federal Credit Union in Alexandria, Virginia on

March 20, 2015, in violation of 18 U.S.C. § 2113(a). [Dkt. 1]. Two months later, on May 28,

2015, a federal grand jury returned a 16-count indictment against Assaye which charged him

with numerous offenses related to a string of bank robberies occurring between October 2013

and March 2015. [See Dkt. 14]. Specifically, Counts 1–6 and 12–13 of the indictment,

respectively, charged Assaye with: robbery of the M&T Bank in Annandale, Virginia on October

22, 2013 (Count 1); robbery of the BB&T Bank in Oakton, Virginia on January 31, 2014 (Count

2); burglary of the M&T Bank in Annandale, Virginia on November 14, 2014 (Count 3); armed

robbery of the SunTrust Bank in Alexandria, Virginia on November 20, 2014 (Count 4); armed

robbery of the M&T Bank in Annandale, Virginia on December 1, 2014 (Count 5); robbery of

the Apple Federal Credit Union in Alexandria, Virginia on March 20, 2015 (Count 6); using,

carrying, and brandishing a firearm during and in relation to the armed robbery charged in Count

4 (Count 12); and using, carrying, and brandishing a firearm during and in relation to the armed

robbery charged in Count 5 (Count 13), in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii), 2, and

2113(a) and (d). Id.

The remaining eight counts of the indictment charged Assaye with additional offenses

related to his brief escape from federal custody on March 31, 2015 following his transfer from

the Alexandria Detention Center to Inova Fairfax Hospital due to a suicide attempt. Id.

Specifically, Counts 7–11 of the indictment, respectively, charged Assaye with: escape from the

custody of the Attorney General, in violation of 18 U.S.C. § 751(a) (Count 7); kidnapping

L.N.K., a guard at Inova Fairfax Hospital who was working with the United States Marshals

Service, in violation of 18 U.S.C. §§ 1201(a)(5) and 1114 (Count 8); assaulting L.N.K. with a

dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1), (b), and 1114 (Count 9); assaulting

T.P., another guard at Inova Fairfax Hospital working with the United States Marshals Service,

with a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1), (b), and 1114 (Count 10); and

being a felon in possession of a firearm by taking L.N.K.'s service firearm from her before he

assaulted her, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1) (Count 11). Id. Additionally,

Counts 14–16, respectively, charged Assaye with using, carrying, and brandishing a firearm

during and in relation to the kidnapping charged in Count 8 (Count 14); the assault with a

2

dangerous weapon charged in Count 9 (Count 15); and the assault with a dangerous weapon charged in Count 10 (Count 16), in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2. Id.

On July 10, 2015, Assaye, through his court-appointed counsel, Assistant Federal Public Defender Brooke Rupert, filed three motions regarding the indictment. In his Motion to Sever Trial of Unrelated Counts, he argued that the counts related to the bank robberies should be severed from the charges related to his escape "to protect [him] from prejudicial misjoinder." [Dkt. 24]. In his Motion to Dismiss Counts 14–16, he argued that Counts 14–16 should be dismissed because, if convicted of those counts, "[he] would be sentenced at least three times for the single use of a firearm." [Dkt. 25]. And in his Motion to Change Venue, he argued that the trial should be moved to the United States District Court for the Western District of Virginia "to ensure that [he] receive[d] a fair trial before a jury untainted by pre-trial publicity." [Dkt. 26]. All three motions were rendered moot by Assaye's subsequent guilty pleas.

On July 23, 2015, Assaye appeared with counsel for a plea hearing, the details of which are central to Assaye's Motion to Vacate. [Dkt. 29]. At the outset, Assaye was placed under an affirmation to tell the truth in answering all of the Court's questions, and confirmed his understanding that, if he lied, the government could prosecute him for perjury. [Dkt. 64 at 5:7–14]. Under the written plea agreement, Assaye agreed to plead guilty to Counts 13 and 15 of the indictment in exchange for all other counts being dismissed. Assaye acknowledged signing the agreement, and stated that he had read it, discussed it thoroughly with defense counsel, asked defense counsel all of his questions about it and received satisfactory answers, and had no questions for the Court about it. [Dkt. 64 at 8:1–10:1]. Assaye also stated that he was not under the care of a doctor for any physical or mental condition, had not taken any medication within

3

the past 24 hours, and was not under the influence of alcohol or other drugs. [Dkt. 64 at 7:16–25].

Next, Assaye confirmed that he understood the proposed plea agreement, was voluntarily agreeing to it, and realized that if it was accepted, he would be bound by all of its terms. [Dkt. 64 at 10:7–11:12]. Various provisions of the proposed plea agreement were then reviewed with Assaye. For example, Assaye confirmed his understanding that he was facing a mandatory minimum sentence of 32 years' imprisonment and that he was waiving his right to appeal his conviction and sentence as long as the sentence he received did not exceed the statutory maximum of life imprisonment. [Dkt. 64 at 12:18–13:3, 17:17–18:8]. Assaye also stated that he understood the rights he was giving up by pleading guilty, including the right to have the Court resolve his three pending motions, that no one had put any force or pressure on him to plead guilty, and that he was fully satisfied with his defense counsel's representation of him throughout his case. [Dkt. 64 at 20:8–10, 24:4–15, 25:5–9].

At this point, the Court made clear that the proposed plea agreement had not yet been accepted, and that Assaye retained the right to change his mind and plead not guilty. [Dkt. 64 at 21:1–5]. The Court then turned to the proposed statement of facts, which Assaye confirmed he had read and signed. He also affirmed that he understood that by signing the statement of facts, he was admitting both the truth of each of those facts and that the government could prove each of those facts beyond a reasonable doubt if the case went to trial. [Dkt. 64 at 25:10–26:1]. Among the facts Assaye admitted were that he had committed 12 bank robberies between October 2013 and March 2015, including the six robberies charged in the indictment, and that he had briefly escaped from federal custody at Inova Fairfax Hospital on March 31, 2015, during

4

which he took L.N.K.'s service firearm and pointed it at both L.N.K. and T.P. [Dkt. 64 at 26:2–25; see also Dkt. 32].

In reviewing the proposed statement of facts with regard to Count 13, which charged Assaye with using, carrying, and brandishing a firearm during and in relation to the armed robbery of the M&T Bank in Annandale, Virginia on December 1, 2014, the following exchange occurred[1]:

> THE COURT: What kind of gun were you carrying in November of 2014?
> THE DEFENDANT: It was an air gun.
> THE COURT: I'm sorry?
> THE DEFENDANT: It was a BB gun.
> THE COURT: I can't hear you.
> THE DEFENDANT: An air gun.
> THE COURT: An air gun?
> THE DEFENDANT: Yeah.
> THE COURT: That still qualifies as a firearm. Do you understand that?
> THE DEFENDANT: Yeah.
> MR. RICH [for the government]: No, it doesn't.
> THE COURT: Or does it not? It does not?
> MR. RICH: It does not, Your Honor.
> THE COURT: I'm looking at the statement of facts. Where is the other firearm discussion?
> MR. SLOAN [for the government]: December 1, Your Honor.
> THE COURT: I'm sorry?
> MR. SLOAN: December 1. That's paragraph 8.
> THE COURT: For the December 1 robbery, this was the one in Annandale, Virginia. It says that you took a firearm from your coat pocket and you pointed it at the teller and demanded money. Did you do that or not?
> THE DEFENDANT: Yes, Your Honor.
> THE COURT: What kind of firearm were you carrying in that bank robbery? This is the one in Annandale.
> THE DEFENDANT: The same, the same air gun.
> MR. RICH: It's not a firearm.
> THE COURT: Well, that's not apparently a firearm. Is it, is it capable of shooting a projectile?
> THE DEFENDANT: Yes, Your Honor.

---

[1] It appears from the transcript of the hearing that the Court initially asked Assaye about the armed robbery of the SunTrust Bank in Alexandria, Virginia on November 20, 2014; however, Count 13 was unrelated to that robbery. [Dkt. 64 at 27:1–8]. As the transcript of the hearing reflects, the proper robbery was eventually clarified.

MR. RICH: Your Honor, I believe the definition of 'firearm' is to expel a projectile through the force of an explosion, and I believe an air gun does not qualify for that. It doesn't explode; it's just a burst of air.

THE COURT: Well, had this been discussed with the defendant before today?

MR. RICH: We haven't discussed it with the defendant, Your Honor, because we are not capable of talking to the defendant, but we've discussed it with defense counsel.

THE COURT: Well, if it's not a firearm, there would not be a – that element of the offense would not be satisfied.

MR. RICH: That's correct, Your Honor.

THE COURT: All right. Ms. Rupert, let me hear from you.

MS. RUPERT [for the defendant]: Your Honor, my understanding from the defendant was that it was a BB gun, that there was something able to be expelled, and that it did qualify under the definition of 'firearm.'

THE COURT: Well, Mr. Rich is an officer of the Court, and I think he's correct that it has to be with an explosive of some kind.

MR. RICH: Through the force of an explosion, that's correct, Your Honor. BB guns, air guns, pellet guns are not firearms under Title 18.

THE COURT: Well, then we don't have an offense.

MR. RICH: We do not, Your Honor.

THE COURT: Now, there's a discussion of a 9mm here.

MR. RICH: Well, that was – that was the one taken from the security guard at Inova Fairfax.

THE COURT: That count [Count 15] would still be solid.

MR. RICH: Yes, it is, Your Honor.

THE COURT: How do you want to proceed?

MR. RICH: If – I'm afraid we're going to have to proceed to trial, Your Honor, because we have testimony – we expect there will be testimony from witnesses at some or all of these bank robberies that identified the firearm as appearing to be a particular type of firearm based on their experience in having fired one and handled one.

THE COURT: I don't have much experience with air guns or BB guns. How close do they look like a real gun? That's the point.

MR. RICH: They can look like a real gun. However, if you look at the barrel, the end of the barrel, which obviously the teller is going to see, a BB gun is going to be a very small apperture [sic]. A 9mm or a .45 or a .38 is going to be considerably larger, and we have testimony from witnesses who say: I have fired that type of gun, and I think it was, I think it was –

MR. SLOAN: A Glock.

MR. RICH: – a Glock. Now, I don't know if it's with this particular count [Count 13] or not, but the testimony of witnesses are going to be that it was a real firearm.

THE COURT: Ms. Rupert, do you want to talk briefly with your client?

MS. RUPERT: Yes, Your Honor, I would, please.

THE COURT: Go ahead.

MS. RUPERT: Thank you.

(discussion between Ms. Rupert and the defendant off the record)

MR. RICH: Yes, Your Honor, just for the record, section 921(a)(3) is the definition of 'firearm,' and it's 'may readily be converted to expel a projectile by the action of an explosive.'

THE COURT: Thank you. The other possibility in the situation would be an Alford plea on that, on that one issue for that one count.

MR. RICH. I'm sorry, Your Honor?

THE COURT: I said the other possibility could be an Alford plea on that one count. There would not appear to be a dispute as to Count 15 if the weapon was seized from the officer, and that is clearly a 9mm, and that therefore would qualify as a firearm.

MR. RICH: That would definitely qualify –

THE COURT: Right.

MR. RICH: – and we have definite evidence on that.

THE COURT: But the other option would be if you-all are interested in it is if you believe your evidence is strong enough to prove beyond a reasonable doubt that a firearm was used, I think that can be –

MR. RICH: We believe it is, Your Honor, and we would be amenable to an Alford plea on that count.

MS. RUPERT: May I explain 'Alford plea'?

THE COURT: Yes.

(discussion between Ms. Rupert and the defendant off the record)

MR. RICH: Your Honor, my colleague advises me that we need to get [the United States Attorney's] approval before we can enter into an Alford plea.

THE COURT: I mean, you understand that this is almost aesthetics at this point because you've already locked this man into a mandatory minimum if he goes down on Count 15 of at least seven years. From what I'm hearing, he's got a very significant criminal history, so you're more talking about a sentencing issue than you are talking about any resolution of guilt or innocence.

MR. RICH: Your Honor, I would ask the Court to consider, though, that there are actually – we indicted three 924(c)'s in connection with the Inova Fairfax escape. So there are three counts of 924(c) just on that one episode. So we're going to insist that there be at least a plea to two 924(c) counts.

THE COURT: All right. Well, I don't have any other court today. I mean, you can go back to your office and –

MR. RICH: Could we have, like, 15 or 20 minutes to talk to [the United States Attorney]? I'm sure that we can –

THE COURT: That will give Ms. Rupert more time to talk with her client, all right?

MS. RUPERT: Thank you.

[Dkt. 64 at 27:1–32:22].

After a 30-minute recess, the discussion continued:

MR. RICH: Your Honor, as I indicated in the DOJ policy, we cannot consent to take an Alford plea. That, of course, does not bind the Court. On the other hand, I've discussed this with Ms. Rupert, we could renegotiate the plea agreement to have a plea to one of the [two] additional 924(c)'s at Inova Fairfax and then take the firearm out of the statement of facts on the bank robbery, and we'd wind up at the same place as far as two 924(c) convictions and the same guideline calculation. That would take us a couple hours to put that together with a new plea agreement and a new statement of facts but –
THE COURT: Well, we're here all day. I mean, again, it's better to have the record complete. It's whatever you-all wanted to do. As you know, the Court is not getting involved in your plea bargaining.
MR. RICH: I understand.
THE COURT: Is that how you want to proceed?
MR. RICH: I think it is. Ms. Rupert is fine with that. The government is fine with just renegotiating the plea and then coming back at the Court's convenience to do the plea.
THE COURT: My only concern here as matter of, again, since we're talking about the requirements of the law, is the brandishing of a firearm at different times during the same course of conduct, would that be considered separate offenses? I mean, for example, if someone goes into a bank, pulls out a firearm, and shows it to teller No. 1, and then maybe five minutes later shows it to the manager but it's all part of the same course of conduct, I'm not positive that would count as two separate 924(c) offenses.
MR. RICH: Your Honor, I believe that was the basis of one of the defendant's motions regarding the 924(c)'s at the hospital. I think the law in this district is clear that under these circumstances, they are separate offenses, and we were ready to respond to that on our motion. I believe, I don't think I'm misrepresenting Ms. Rupert's position on that, that she conceded that but raised it just to preserve the issue.
THE COURT: In other words, if the firearm is displayed at different times during the same course of conduct to different victims, each display counts as a separate 924 offense?
MR. RICH: I believe it does, Your Honor.
THE COURT: All right. I mean, I'll take you – Ms. Rupert, is that your understanding of the law as well?
MS. RUPERT: Your Honor, I will go back and confirm. My understanding is that it's based on the predicate offense, and since there are more than one – since there's more than one assault charged, it could be two separate offenses.

[Dkt. 64 at 33:8–35:4].

After a two-and-a-half-hour recess, Assaye's plea hearing was resumed, and Assaye

confirmed his understanding that he was still under an affirmation to tell the truth. [Dkt. 64 at

38:1–7]. Under the revised plea agreement, Assaye agreed to plead guilty to Counts 15 and 16 of

8

the indictment. Assaye again acknowledged that he had signed the new plea agreement, and stated that he had discussed it with defense counsel and had asked defense counsel all of his questions about it. [Dkt. 64 at 38:8–17]. Both Assaye and defense counsel also confirmed that "the only thing that's changed in the plea agreement itself is that [Assaye] [is] now pleading guilty to Counts 15 and 16," both of which "involve[ed] what happened at Fairfax Inova Hospital, where the firearm which [he] took from one guard was used . . . against two different guards." [Dkt. 64 at 38:18–39:7]. Assaye again stated that he was fully satisfied with his defense counsel's negotiation of the plea agreement. [Dkt. 64 at 40:21–23]. The Court subsequently stated: "Then we're back to the statement of facts, because I'm going to incorporate all of your answers to my questions in the earlier plea colloquy into this one." [Dkt. 64 at 40:24–41:2].

The Court then turned to the statement of facts, which Assaye again confirmed that he had read, understood, and voluntarily signed. Assaye again acknowledged that he was admitting both the truth of each fact and that the government could prove each fact beyond a reasonable doubt. [Dkt. 64 at 41:3–19.] Paragraph 13 of the statement of facts, which set out the facts underlying Counts 15 and 16, was reviewed in detail. That paragraph stated:

> On or about March 31, 2015, the defendant escaped from federal custody while receiving medical treatment at Inova Fairfax Hospital located at 3300 Gallows Road, Falls Church, Virginia, within the Eastern District of Virginia. During his escape, the defendant physically assaulted a security guard, L.N.K., who was assisting the United States Marshals Service and guarding the defendant in his hospital room, overpowered her, and took her service firearm from her body. As the defendant started to exit his hospital room, he encountered a second security guard, T.P., who was assisting the United States Marshals Service, and the defendant pointed the commandeered firearm at T.P. The defendant subsequently grabbed L.N.K. and pulled her down the hospital hallway while pointing the commandeered firearm at her.

[Dkt. 32]. During the hearing, Assaye agreed that this paragraph was accurate, and specifically agreed that he "pointed [the] firearm at two different guards." [Dkt. 64 at 41:20–42:23].

9

Assaye confirmed that he made no claim of innocence as to Count 15 or Count 16 and entered pleas of guilty to both counts. [Dkt. 64 at 43:3–12]. Defense counsel stated that she believed Assaye had entered the pleas knowingly and voluntarily, and that the pleas accorded with her understanding of the facts and law. [Dkt. 64 at 43:17–22]. The Court also explained that it had reviewed the relevant Fourth Circuit law regarding separate 924(c) offenses, and that "although the Fourth Circuit might have a different approach from some of the other circuits, in this case, it is two separate individuals who were threatened with – or to whom the firearm was brandished, and that in my view would be more than sufficient certainly in this circuit to find the defendant guilty of two separate 924(c) offenses." [Dkt. 64 at 44:1–6]. Accordingly, Assaye's guilty pleas to Counts 15 and 16 were accepted. [Dkt. 64 at 44:7].

Before adjourning, there was a discussion regarding the facility at which Assaye would be detained until his sentencing hearing. During that discussion, defense counsel informed the Court that Assaye had attempted to commit suicide at the Alexandria Detention Center. [Dkt. 64 at 51:7–10]. Defense counsel also informed the Court that Assaye was "receiving some [mental health] counseling" and "taking some [mental health] medication" at his current facility, the Northern Neck Regional Jail. [Dkt. 64 at 51:11–17]. Upon learning this information, the Court instructed Assaye to return to the lectern, at which point the following exchange occurred:

> THE COURT: Mr. Assaye, this morning when I asked you whether you were being treated for any physical or mental condition, I think your answer was no. Are you getting any treatment for any medical condition right now?
> THE DEFENDANT: I'm getting medication.
> THE COURT: All right.
> MS. RUPERT: For insomnia, Your Honor.
> THE COURT: All right. What medication are you taking?
> THE DEFENDANT: It's an antidepressant.
> THE COURT: An antidepressant. Do you know the name of it by chance?
> THE DEFNEDANT: No.
> THE COURT: All right. Now, did you take that medication today?
> THE DEFENDANT: No.

10

THE COURT: When do you normally take your medicine?
THE DEFENDANT: At night, but I didn't take it last night. Sometimes I don't take it.
THE COURT: When you don't take the medicine, how does that affect the way you feel?
THE DEFENDANT: Well, I feel it just helps me to, to sleep.
THE COURT: It helps you to sleep. Did you sleep all right last night?
THE DEFENDANT: Yeah.
THE COURT: Are you today, have been at all either this morning, when you were in court with me, or now, have you been feeling any of the effects of not taking your medicine?
THE DEFENDANT: No.
THE COURT: Have you had trouble understanding any of the questions I've asked you today?
THE DEFENDANT: No.

[Dkt. 64 at 51:20–53:3].

Over two months later and two days before his sentencing hearing, on October 7, 2015,

Assaye filed a Motion to Convert Sentencing to Status Hearing, in which he argued that he

should be allowed to withdraw his guilty pleas because they were made "involuntarily,"

"unknowing[ly]," and due to "ineffective assistance of counsel." [Dkt. 49]. In response, the

government stated that it "d[id] not oppose a brief delay in sentencing to address the defendant's

potential claims," and provided the Court with "[a] brief memorandum of law regarding the

withdrawal of guilty pleas to aid the Court as it determine[d] how to proceed with this matter,"

which included the six factors set out in United States v. Moore, 931 F.2d 245, 248 (4th Cir.

1991). [Dkt. 50]. Under Moore, a defendant must present "a fair and just reason" for withdrawal

of his guilty plea, and the court must consider several factors in determining whether a defendant

has made the requisite showing, including "(1) whether the defendant has offered credible

evidence that his plea was not knowing or not voluntary, (2) whether the defendant has credibly

asserted his legal innocence, (3) whether there has been a delay between the entering of the plea

and the filing of the motion, (4) whether the defendant has had close assistance of competent

counsel, (5) whether withdrawal will cause prejudice to the government, and (6) whether [withdrawal] will inconvenience the court and waste judicial resources." 931 F.2d at 248.

At Assaye's sentencing hearing, on October 9, 2015, Assaye's Motion to Convert Sentencing to Status Hearing was denied because he had not presented "a fair and just reason" for withdrawal of his guilty pleas. [See Dkt. 52, 59]. With regard to the six Moore factors, the Court reasoned (1) that Assaye "went through a full Rule 11 colloquy with the Court" in which he "didn't make any claim of being forced into the plea or not knowing what he was doing," (2) that the evidence against Assaye was "overwhelming" because "he was literally caught red-handed," (3) that there had been an "extensive" delay of over two months between the plea hearing and Assaye's motion, (4) that Assaye had been represented by "obviously competent counsel" who had "appeared before this Court for years," (5) that, if Assaye's guilty pleas were withdrawn, the government would have to "pull [a lot of] witnesses together" given that there we "16 counts in the original indictment," and (6) that "there's always a waste of [judicial] resources" when a guilty plea is withdrawn, although that factor "really isn't critical." [Dkt. 59 at 4:16–6:19]. Following the ruling, Assaye made an oral motion for the appointment of new counsel on the ground that he had received ineffective assistance from his current counsel. [Dkt. 59 at 7:6–8:13]. The Court denied that motion, stating: "We're going to go forward with the sentencing . . . [a]nd we'll obviously direct that a different counsel be appointed to handle the appeal since that may very well involve issues related to how the plea was conducted." [Dkt. 59 at 8:14–23].

At the conclusion of the hearing, Assaye was given an opportunity to address the Court. [Dkt. 59 at 17:1–2]. As relevant here, Assaye stated:

> Your Honor, I'm sorry for the crimes I committed, but I believe that during the escape, that some of the facts is not true. The gun was not loaded, and at the time,

you know, I wasn't medically cleared, like, I was really suffering from a mental trauma, and the guards, they, they – I know they can verify that gun was not loaded, couldn't have harmed nobody . . . . Your Honor, I admit to my crimes, but I didn't never point at the time, if you look at the circumstances and the situation I was in and the way that the door was positioned, there's no way I could have pointed that gun at [T.P.]. The room was dark. There's no way I could have pointed the gun. I didn't point the gun at him. I admit to leaving there, I admit to having the unloaded gun, but that part I'm not going to admit to because I didn't do it.

[Dkt. 59 at 17:3–21]. Assaye was sentenced to 384 months' imprisonment, which was the mandatory minimum sentence for his two § 924(c) convictions.[2] [Dkt. 53].

Assaye timely appealed both his sentence and the denial of his Motion to Convert Sentencing to Status Hearing. [Dkt. 57]. On appeal, Steven Hanna, Assaye's new court-appointed counsel, argued that "the district court erred in denying his motion to withdraw his guilty plea, and abused its discretion in denying his motion to appoint new counsel." [Dkt. 66]. In response, the government "moved to dismiss the appeal based on an appellate waiver contained in the plea agreement and further assert[ed] that Assaye's claims [were] without merit." Id.

On January 13, 2017, the Fourth Circuit affirmed the decisions below in all respects. Id. At the outset, the court concluded that although "Assaye knowingly and voluntarily executed the appellate waiver," "the issues raised on appeal [were] within the narrow class of alleged errors that automatically fall outside the scope of an appellate waiver." Id. With regard to the merits of Assaye's first claim, the court concluded that "the district court did not abuse its discretion in denying Assaye's motion" under the six Moore factors. Id. Specifically, the court reasoned (1) that "the district court's thorough plea colloquy and Assaye's answers to the court's questions

---

[2] This sentence was also the same sentence which Assaye acknowledged during the plea hearing as the minimum sentence to which he was exposed. [Dkt. 64 at 12:18–13:3].

confirm[ed] that he knowingly and voluntarily pled guilty to the charges," (2) that Assaye "ha[d]

offered no credible evidence of his innocence" and "twice agreed to facts that established his

factual guilt," (3) that "there was a significant and unexplained delay between the entry of

Assaye's guilty plea and the filing of any motion to withdraw that plea," and (4) that "[a]lthough

[defense] counsel provided Assaye with some erroneous advice" regarding whether an air gun

can constitute a firearm under the federal criminal code, that advice "was ultimately irrelevant to

the final plea agreement, which was the result of several rounds of negotiation," and defense

counsel was ultimately "able to secure a substantial reduction in Assaye's potential sentence." Id.

With regard to the merits of Assaye's second claim, the court concluded that "the district court

did not abuse its discretion in denying Assaye's motion for replacement counsel" given "the

tim[ing] of the motion," "the adequacy of the court's subsequent inquiry," and the extent of

"communication" between Assaye and defense counsel. Id. Lastly, the court observed that

"although Assaye ha[d] filed a motion to submit a pro se supplemental brief" raising additional

claims, that motion was improper because Assaye's new counsel had "filed a merits brief on

Assaye's behalf." Id.

On December 4, 2017, Assaye timely filed his Motion to Vacate. [Dkt. 71]. The motion

was subsequently stayed to await the Supreme Court's decision in United States v. Davis, 139 S.

Ct. 2319 (2019), because one ground for relief Assaye had asserted was that his trial and

appellate counsel had rendered ineffective assistance by failing to argue that his convictions were

unconstitutional in light of the decision in Johnson v United States, 135 S. Ct. 2551 (2015). [Dkt.

104]. Shortly after the Supreme Court decided Davis, the Court ordered supplemental briefing on

Assaye's claim. [Dkt. 105]. The parties' supplemental briefing has been completed, and the

Motion to Vacate is now ripe for decision. [Dkt. 109].

14

II.

"A federal prisoner, in custody, may collaterally attack his sentence or conviction by

moving the district court to vacate, set aside or correct the sentence pursuant to 28 U.S.C.

§ 2255." Umar v. United States, 161 F. Supp. 3d 366, 373 (E.D. Va. 2015). "To obtain such

relief, a [movant] bears the burden of proving that his sentence or conviction was imposed in

violation of the Constitution or laws of the United States, that the district court was without

jurisdiction to impose such sentence, that the sentence exceeds the maximum authorized by law,

or that the sentence is otherwise subject to collateral attack." Id. "[A] petitioner must prove the

asserted grounds for relief by a preponderance of the evidence." Id. "However, a pro se [movant]

is entitled to have his [motion] and issues asserted therein construed liberally." Pemberton v.

United States, 352 F. Supp. 3d 610, 613 (E.D. Va. 2019). "Upon reviewing a § 2255 motion, the

district court may, in its discretion, deny the motion without a hearing . . . if the motion and the

files and records of the case show that the [movant] is entitled to no relief." Id.

Assaye's Motion to Vacate asserts four grounds for relief. Liberally construed, the

grounds respectively allege that his trial and appellate counsel rendered ineffective assistance by

failing to argue (1) that Counts 15 and 16 were impermissibly duplicative, (2) that Counts 15 and

16 were unconstitutional in light of the Supreme Court's decisions in Johnson and Davis, (3) that

the government engaged in prosecutorial misconduct by attempting to convict Assaye of firearm

charges which could not be proven given that Assaye only possessed an air gun or BB gun

during the some of the charged robberies, and (4) that Assaye's trial counsel forced him to enter

15

into the plea agreement and otherwise failed to give him proper legal advice. Because none of these claims is meritorious, the Motion to Vacate will be dismissed.[3]

Under the two-pronged test set out in Strickland v. Washington, 466 U.S. 668, (1984), "[t]o demonstrate ineffective assistance of counsel, [Assaye] must show (1) that [defense] counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense." Rodriguez v. Bush, 842 F.3d 343, 346 (4th Cir. 2016). The first prong, referred to as the "performance prong," requires a showing that defense counsel's performance "fell below an objective standard of reasonableness," and the second prong, referred to as the "prejudice prong," requires a showing of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." United States v. Higgs, 663 F.3d 726, 735 (4th Cir. 2011). The performance prong "is governed by the law as it stood when the defendant's lawyer acted," and the prejudice prong "is governed by the law as it stands at the time a court is considering a defendant's ineffective-assistance claim." United States v. Baker, 719 F.3d 313, 321 (4th Cir. 2013). Here, Assaye has not satisfied either prong because the arguments he wishes his counsel had made were not meritorious then and are not meritorious now, and "failure to raise a meritless argument can never amount to ineffective assistance."

---

[3] Assaye's 17-page Motion to Vacate, 37-page reply brief, and 2-page supplemental brief include many inconsistent and at times incomprehensible allegations. For example, in his reply brief, Assaye states: "It is clear that both the U.S. Attorney and defense counsel should not, and could not, no longer continued on with this case [sic]. Because they were both corrupt, and their plot against the defendant had been exposed, and the whole procedures was taint [sic] as 'fruit of the poisonous tree.' Defendant will continue to address the government's motion that came from the corrupt sources, since he has no choice, although everything should be suppress [sic]." [Dkt. 97 at 6]. Despite such lengthy and confusing pleading, "in accordance with the liberal construction [the Court] afford[s] a pro se [petitioner]," the Court has construed Assaye's Motion to Vacate "as best [it] can given the thrust of [his] [allegations]." Kerr v. Marshall Univ. Bd. of Governors, 824 F.3d 62, 72 (4th Cir. 2016).

Juniper v. Zook, 117 F. Supp. 3d 780, 791 (E.D. Va. 2015); Moore v. United States, 934 F. Supp. 724, 731 (E.D. Va. 1996).

### 1. **Ground 1**

In his first ground for relief, Assaye argues that his counsel should have argued that Counts 15 and 16 of the indictment—two of the three § 924(c) offenses related to his escape from Inova Fairfax Hospital—were impermissibly duplicative because Counts 9 and 10 of the indictment—the substantive offenses on which Counts 15 and 16 were predicated, respectively— arose out of "one single episode" in which "everything happen[ed] within seconds."[4] [Dkt. 97; see also Dkt. 71]. In response, the government argues that "the indictment here was not multiplicitous under controlling Fourth Circuit precedent," a conclusion which was "recognized by both the Court and the parties at the plea hearing." [Dkt. 80]. The government has the better argument.

Under the Fourth Circuit's decision in United States v. Khan, 461 F.3d 477 (4th Cir. 2006), "there is no requirement that multiple and consecutive § 924(c) [convictions and] sentences rest on the use of different firearms or distinct uses of the same firearm." United States v. Jordan, 952 F.3d 160, 170 (4th Cir. 2020). To the contrary, as long as the predicate offenses "are not duplicative for double jeopardy purposes, they may support [multiple] § 924(c) convictions and sentences." Id. Although this rule "conflicts with the rule adopted by several other circuits," which "prohibit[s] multiple § 924(c) sentences arising from a single use of a

---

[4] To the extent Assaye argues that Count 14, the other § 924(c) offense related to his escape, was impermissibly duplicative of Counts 15 or 16 because Count 8, the substantive offense on which Count 14 was predicated, was impermissibly duplicative of Counts 9 or 10, that argument is plainly without merit because Assaye did not plead guilty to Count 14 and therefore cannot make the requisite showing of prejudice. See Higgs, 663 F.3d at 735.

firearm," it remains good law in this circuit. Id. The Court and the parties recognized as much during Assaye's plea hearing. [Dkt. 64 at 34:3–35:4, 44:1–6].

In determining whether predicate offenses are duplicative for double jeopardy purposes, courts apply one of two tests depending on the statutory provisions at issue. If the predicate offenses charge violations of "two distinct statutory provisions," courts apply the Blockburger analysis, which asks "whether each provision requires proof of an additional fact which the other does not." United States v. Martin, 523 F.3d 281, 291 (4th Cir. 2008); see, e.g., United States v. Oliver, 513 F. App'x 311, 315 (4th Cir. 2013). In contrast, if the predicate offenses charge "multiple violations of the same statute," courts consider "what Congress has made the allowable unit of prosecution" based on "the language of the statute." United States v. Shrader, 675 F.3d 300, 313 (4th Cir. 2012); see, e.g., United States v. Williams, 413 F. App'x 583, 583 (4th Cir. 2011). Here, the predicate offenses at issue are Count 9, which is the predicate offense for Count 15,[5] and Count 10, which is the predicate offense for Count 16.[6] Counts 9 and 10 both charge

---

[5] Count 15 specifically charges that "[o]n or about March 31, 2015," Assaye "did knowingly and unlawfully use, carry, and brandish a firearm, to wit: a 9mm Smith & Wesson semiautomatic pistol, during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, to wit: Assault on a Federal Officer, in violation of [18 U.S.C. § 111], as set forth in Count 9 of this indictment." [Dkt. 14]. Count 9 specifically charges that "[o]n or about March 31, 2015," Assaye "did forcibly assault, resist, oppose, impede, intimidate and interfere with [L.N.K.] by use of a deadly and dangerous weapon, to wit: a firearm, while [L.N.K.] was engaged in the performance of her official duties, those duties being assisting the United States Marshals Service in maintaining [Assaye] in custody as a federal prisoner." Id.

[6] Count 16 specifically charges that "[o]n or about March 31, 2015," Assaye "did knowingly and unlawfully use, carry, and brandish a firearm, to wit: a 9mm Smith & Wesson semiautomatic pistol, during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, to wit: Assault on a Federal Officer, in violation of [18 U.S.C. § 111], as set forth in Count 10 of this indictment." [Dkt. 14]. Count 10 specifically charges that "[o]n or about March 31, 2015," Assaye "did forcibly assault, resist, oppose, impede, intimidate and interfere with [T.P.] by use of a deadly and dangerous weapon, to wit: a firearm, while [T.P.] was engaged in the performance of his official duties, those duties being assisting the United States Marshals Service in maintaining [Assaye] in custody as a federal prisoner." Id.

Assaye with assaulting a federal officer with a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1), (b), and 1114. Accordingly, only the second test is implicated.

Under 18 U.S.C. § 111, the unit of prosecution is "the number of distinguishable acts of assault," not the number of federal officers assaulted. United States v. Thomas, 669 F.3d 421, 426 (4th Cir. 2012); see also United States v. Hopkins, 310 F.3d 145, 152 (4th Cir. 2002); United States v. Rivera Ramos, 856 F.2d 420, 422 (5th Cir. 1988). In other words, regardless of the number of federal officers assaulted, "[a]n indictment may divide a course of conduct into separate assaults only when the government demonstrates that the actions and intent of the defendant constitute distinct successive criminal episodes, rather than two phases of a single assault." Thomas, 669 F.3d at 426. "Courts look to a variety of factors to determine if a series of acts constitute more than mere phases of a single assault and so can support multiple assault charges," including whether the assaults were "separated in both time and location," whether "the assailant gave each officer individual attention, and in succession" during the assaults, and whether "significant intervening acts" occurred between the assaults. Id.

Here, the facts underlying the two assaults were set out in paragraph 13 of the statement of facts, which stated:

> On or about March 31, 2015, the defendant escaped from federal custody while receiving medical treatment at Inova Fairfax Hospital located at 3300 Gallows Road, Falls Church, Virginia, within the Eastern District of Virginia. During his escape, the defendant physically assaulted a security guard, L.N.K., who was assisting the United States Marshals Service and guarding the defendant in his hospital room, overpowered her, and took her service firearm from her body. As the defendant started to exit his hospital room, he encountered a second security guard, T.P., who was assisting the United States Marshals Service, and the defendant pointed the commandeered firearm at T.P. The defendant subsequently grabbed L.N.K. and pulled her down the hospital hallway while pointing the commandeered firearm at her.

19

[Dkt. 32]. In accordance with this paragraph, the first charged assault occurred when, as Assaye

"started to exit his hospital room," he "encountered" T.P. and "pointed the commandeered

firearm at T.P.," and the second charged assault occurred when he "subsequently grabbed L.N.K.

and pulled her down the hospital hallway while pointing the commandeered firearm at her."[7]

[Dkt. 32; see also Dkt. 64 at 41:12–42:23]. Although these two assaults occurred close together

in both time and location, Assaye "gave each officer individual attention, and in succession," and

therefore his conduct "can support multiple assault charges." Thomas, 669 F.3d at 426. The

Tenth Circuit's decision in United States v. Hodges, 436 F.2d 676 (10th Cir. 1971), which was

cited favorably on this issue in Thomas, also supports this conclusion. In that case, the court held

that five assault charges could be brought after an inmate attacked five prison guards because the

inmate "gave each [guard] individual attention, and in succession," even though all of the attacks

occurred "in the dormitory" and only "moments" after each other. Id. at 677–78.

Additionally, after Assaye pointed the firearm at T.P., but before pointing it at L.N.K.,

T.P. fired a shot at Assaye which forced him to retreat back into his hospital room, at which

point Assaye "grabbed" L.N.K. and "pulled" her into the hallway.[8] [Dkt. 32; see also Dkt. 64 at

---

[7] In his Motion to Vacate, Assaye vehemently disputes that he ever pointed the firearm at T.P., [see, e.g., Dkt. 97 at 6–7, 19–20]; however, Assaye admitted that he pointed the firearm at T.P. both in the statement of facts and at the plea hearing. Indeed, at the plea hearing, the Court specifically asked Assaye whether he had "pointed th[e] firearm at two different guards," and Assaye responded, "Yes." [Dkt. 64 at 42:19–23]. Accordingly, Assaye's belated dispute of that fact will not be considered. See United States v. Murillo, 927 F.3d 808, 817 (4th Cir. 2019) ("In the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should, without holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn statements.").

[8] That T.P. fired a shot at Assaye was not in the statement of facts or discussed at the plea hearing; however, because the government discussed it at the sentencing hearing and Assaye admits it multiple times in his reply brief, it has been considered. [See Dkt 54 at 10:10–11:18; Dkt. 97 at 7, 20].

41:12–42:23]. These events constituted "significant intervening acts" and therefore "provide

sound support for the conclusion that [Assaye's] assaults were distinct." Thomas, 669 F.3d at

426. Indeed, these intervening events are fairly similar to those at issue in Thomas, where,

between the two the assault, the officer "radioed . . . for assistance," the assailant "pushed" the

officer, and the officer "put out a general assistance alarm." Id. Because Count 9 is not

impermissibly duplicative of Count 10, Count 15 is not impermissibly duplicative of Count 16.

Therefore, Counts 9 and 10 "may support [multiple] § 924(c) convictions and sentences," and

Assaye's first ground for relief fails.[9] Jordan, 952 F.3d at 170.

## 2. **Ground 2**

In his second ground for relief, Assaye argues that his counsel should have argued that

Counts 15 and 16 were unconstitutional in light of the Supreme Court's decision in Johnson

because the substantive offense on which they were predicated—assault on a federal officer with

a dangerous weapon in violation of 18 U.S.C. §§ 111(a)(1) and (b)—"does not qualify as a crime

of violence." [Dkt. 71]. In response, the government argues that assault on a federal officer with

a dangerous weapon "is a crime of violence" because it necessarily involves either the use of a

---

[9] Even if Counts 9 and 10 had been impermissibly based on "two phases of a single assault," it is not clear that Assaye would have been entitled to relief from one of his corresponding § 924(c) sentences in Counts 15 and 16. Thomas, 669 F.3d at 426. The Fourth Circuit has frequently held that "multiple, consecutive sentences under § 924(c)(1) are appropriate whenever there have been multiple acts of firearm usage or carriage, even when all of those acts related to a single predicate offense." United States v. Dire, 680 F.3d 446, 477 (4th Cir. 2012) (emphasis in original); see also United States v. Lighty, 616 F.3d 321, 371 (4th Cir. 2010). Here, it appears that Assaye brandished the firearm twice during and in relation to the single assault; under such circumstances, the Fourth Circuit has approved multiple, successive § 924(c) sentences. See, e.g., Lighty, 616 F.3d at 371; Oliver, 513 F. App'x at 215; see also Jordan, 952 at 170 ("[T]his is not the kind of case that has troubled some courts, in which the evidence presented makes clear that multiple § 924(c) convictions rest on a single use of a single gun.").

dangerous weapon or the infliction of bodily injury, as courts throughout the country have
routinely held. [Dkt. 80]. The government has the better argument.

"Section 924(c) provides that a person who uses or carries a firearm during and in
relation to any crime of violence, or who possesses a firearm in furtherance of any such crime,
may be separately convicted of both the underlying crime of violence and the use, carrying, or
possession of that firearm. United States v. Bryant, 949 F.3d 168, 172 (4th Cir. 2020). A "crime
of violence" is defined in § 924(c)(3) as "a felony and [either] (A) has as an element, the use,
attempted use, or threatened use of physical force against the person or property of another, or
(B) that by its nature, involves a substantial risk that physical force against the person or property
of another may be used in the course of committing the offense." Id. "Courts refer to
§ 924(c)(3)(A) as the force clause and to § 924(c)(3)(B) as the (now-invalid) residual clause." Id.

"In light of Davis," which held that the residual clause was unconstitutional, "the parties
now agree that [Assaye's § 111(a)(1) and (b) convictions] only qualif[y] as a crime of violence if
[they] satisfy the force clause." Id. "To determine whether an offense qualifies as a crime of
violence under the force clause of § 924(c)(3)(A), [courts] apply the categorical approach or the
modified categorical, depending on the nature of the offense." Id. "Under this approach, [courts]
focus on the elements of the prior offense rather than the conduct underlying the conviction, and
ask whether those elements necessarily require the use attempted use, or threatened use of
physical force." Id. If so, then the offense is categorically a crime of violence under the force
clause. Id.

Here, the Court need not reinvent the wheel. Multiple courts in this district have held, and
the Fourth Circuit more recently has strongly suggested, that assault on a federal officer with a
dangerous weapon in violation of 18 U.S.C. § 111(a)(1) and (b) qualifies as a crime of violence

under the force clause. See, e.g., Larode v. United States, 356 F. Supp. 3d 561 (E.D. Va. 2019);

Gurewardher v. United States, 2019 WL 4259460 (E.D. Va. Sept. 5, 2019); Ali v. United States,

2019 WL 4261111 (E.D. Va. Sept. 5, 2019); Umar v. United States, 2019 WL 4261113 (E.D.

Va. Sept. 5, 2019); see also Bryant, 949 F.3d at 182 n.12; United States v. Lewis, 724 F. App'x

269, 270 (4th Cir. 2018). These cases are persuasive.

Section 111 states:

(a) Whoever –

(1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any
person designated in section 1114 of this title while engaged in or on account of
the performance of official duties . . .

shall, where the acts in violation of this section constitute only simple assault, be
fined under the title or imprisoned for not more than one year, or both, and where
such acts involve physical contact with the victim of that assault or the intent to
commit another felony, be fined under this title or imprisoned not more than 8
years, or both.

(b) Whoever, in the commission of any acts described in subsection (a), uses a
deadly weapon (including a weapon intended to cause death or danger but that
fails to do so by reason of a defective component) or inflicts bodily injury, shall
be fined under this title or imprisoned not more than 20 years, or both.

"Many courts have concluded that although [§ 111(a)(1)] uses the adverb 'forcibly,' it is

categorically not a crime of violence because the government need not prove, and an adjudicator

need not find, that the offense involved violent force capable of causing physical pain or injury."

Larode, 356 F. Supp. 3d at 571. "Yet the Court need not address this line of cases . . . because

§ 111 is plainly divisible," and "the Court may take notice of the fact that [Assaye] was charged

with violating § 111(b), which unquestionably qualifies as a crime of violence." Id. at 571–72.

"Section 111(b) establishes an enhanced penalty provision for any defendant who 'uses a

deadly or dangerous weapon . . . or inflicts bodily injury' in the course of forcibly assaulting,

resisting, opposing, impeding, intimidating, or interfering with a federal officer in the course of

that officer's performance of official duties." Id. at 572. "Both [of these] forms of an enhanced

§ 111(b) charge qualify as predicate crimes of violence under § 924(c)(3)(A)." Id. As to the

former, "[c]ourts have uniformly held that by combining the requirement of forcible action with

the use of a deadly weapon, § 111(b) elevates the lower degree of physical force under

[§ 111(a)(1)] into violent force sufficient to establish § 111(b) as a crime of violence." Id.

(collecting cases). As to the latter, "if a slap in the face counts as violence under Johnson, then a

fortiori, a forcible act that inflicts bodily injury counts as well." Id. Accordingly, § 111(b)

"qualifies as a crime of violence under the force clause." Id.; see also, e.g., Gurewardher, 2019

WL 4259460, at *2 ("Consistent with the holding in Larode, federal courts addressing § 111(b)

offenses in the context of analyzing the § 924(c) force clause, or other similarly worded force

clauses, have all held that § 111(b), when considered within the framework that includes less

serious crimes in [§ 111(a)(1)], is categorically a force clause crime of violence regardless of

whether the § 111(b) crime is committed with a deadly weapon, or committed in a manner that

causes bodily injury." (collecting cases)).[10]

This conclusion is further supported by the Fourth Circuit's recent decision in Bryant, in

which the court held that "the aggravated clause contained in 18 U.S.C. § 2114(a), which

requires that the defendant wound or put the victim's life in jeopardy by use of a dangerous

---

[10] "This Court acknowledges that it may be possible to weave a fanciful hypothetical of a
[§ 111(a)(1)] offense whereby the perpetrator forcibly assaults, resists, opposes, or impedes a
federal officer in a manner that constitutes only simple assault, yet in doing so, inflicts bodily
injury, creating a theoretical possibility of prosecution under § 111(b)." Gurewardher, 2019 WL
4259460, at *2 n.4. "[Assaye], however, does not identify a single case where § 111(b) was
interpreted/applied in such manner, nor has the Court located any such case." Id. "After
considering the language of the statute and the relevant case law, this Court rejects such a
fanciful hypothetical[;] [t]he fact that § 111 includes multiple divisible crimes with different
punishments, as well as the fact that § 111(b) is the most serious form of criminal violation under
such statute and includes a vastly enhanced maximum punishment, further suggests that § 111(b)
does not sweep broadly enough to capture non-violent conduct." Id.

weapon during the commission of the basic offense, is categorically a crime of violence under

the force clause of § 924(c)(3)(A)." Id. at 182. In so holding, the court observed that "courts have

also reached similar conclusions in interpreting other assault statutes," and cited multiple cases

analyzing § 111(b). Id. at 181 n.12. Given this wealth of precedent, it is clear that Assaye's

second ground for relief is meritless.

### 3.  **Ground 3**

In his third ground for relief, Assaye argues that the government engaged in five

instances of prosecutorial misconduct when prosecutors: (1) "lied to the Grand Jury by telling

them that the BB gun was a real gun;" (2) "trick[ed] [Assaye] [into] plead[ing] guilty to said

improper charge;" (3) "charged multiple [duplicative] counts in the indictment;" (4) "took said

defective indictment . . . to the court to use for a plea colloquy;" and (5) "breached the plea

agreement by allowing [Assaye] to plea guilty to Count 16, which was one of the counts that [the

government] had agreed would be dismissed." [Dkt. 71, 97]. In response, the government

correctly argues that Assaye's assertions "misstate the record and are frivolous." [Dkt. 90].

"To prevail on a claim of prosecutorial misconduct, a defendant must show (1) that the

prosecutor's remarks or conduct were, in fact, improper and (2) that such remarks or conduct

prejudiced the defendant to such an extent as to deprive the defendant of a fair trial." United

States v. Allen, 491 F.3d 178, 191 (4th Cir. 2007). Here, "there is no evidence whatsoever that

the government acted improperly in any manner." Id. At the outset, Assaye's third allegation is

unpersuasive because, as previously discussed, he was not charged with or convicted of any

impermissibly duplicative counts. See, e.g., Jordan, 952 F.3d at 170. Additionally, Assaye's fifth

allegation is unpersuasive because the Court never accepted the initial plea agreement, pursuant

to which the government would have dismissed Count 16, and "[a] plea agreement has no effect

until accepted by the court under Rule 11." United States v. Fagge, 101 F.3d 232, 234 (2d Cir.

1996); see also United States v. Allen, 829, F.2d 1121, at *1 (4th Cir. Sept. 17, 1987) ("[A] plea

agreement is a mere executory agreement . . . until embodied in the judgment of a court[.]").

With regard to his remaining allegations, although Assaye avers that he possessed an air

gun during some of the charged robberies, a review of the plea hearing transcript shows that the

government was prepared to present evidence that Assaye in fact possessed an actual firearm.

For example, the government proferred that "there w[ould] be testimony from witnesses at some

or all of the[] bank robberies that identified the firearm as appearing to be a particular type of

firearm based on their experience in having fired and handled one." [Dkt. 64 at 29:21–30:13].

Contrary to Assaye's allegations, there is simply no indication that the government attempted to

prosecute firearm charges against him which it knew were defective. Accordingly, Assaye's third

ground for relief is meritless.

### 4.  **Ground 4**

In his fourth and final ground for relief, Assaye summarily argues that his trial counsel

forced him to enter into the plea agreement and otherwise failed to give him proper legal advice.

In particular, Assaye argues that his trial counsel "misadvised [him] to not inform the [Court]

that he was mentally impaired" during the plea hearing because he had taken "Remeron," which

he refers to as an "insanity medication," during one of the Court's recesses. [Dkt. 71]. In

response, the government argues that Assaye's allegations are "demonstrably false and

frivolous." [Dkt. 80]. The government has the better argument.

At the outset, it appears that Remeron is the antidepressant about which the Court

questioned Assaye at the conclusion of the plea hearing. [See Dkt. 64 at 51:20–53:3]. To the

extent that Assaye now claims that he had taken Remeron before or during the hearing, and that

this medication rendered his guilty pleas unknowingly or involuntary, that claim is belied by the transcript. During the hearing, Assaye confirmed that he had not "take[n] that medication today," that he was not "feeling any of the effects of not taking [that] medic[ation]," and that he had no difficulty "understanding any of the questions" he had been asked. [Dkt. 64 at 52:8–53:3]. As previously discussed, "[i]n the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should, without holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn statements." Murillo, 927 F.3d at 817. Accordingly, this allegation is meritless.

Similarly meritless is Assaye's baseless allegation that his trial counsel forced him to enter into the plea agreement. "Courts construe a pro se litigant's pleadings liberally[;] [h]owever, the pro se litigant must include each ground supporting his claim for relief in his § 2255 motion, and he must state his factual allegations with sufficient particularity to give a reader enough notice to determine whether the motion requires further review." Gualtero v. United States, 2017 WL 4250532, at *3 (E.D. Va. Sept. 25, 2017). "No hearing is required in a § 2255 proceeding . . . if the allegations in the motion are unreasonably vague, conclusory, or incredible." Id.; see also United States v. Rivers, 2019 WL 4418992, at *4 (E.D. Va. Sept. 16, 2019) ("It was incumbent upon [the movant] to provide sufficient facts supporting each ground in his § 2255 motion. Because [he] presented nothing more than vague and conclusory claims, no further investigation is required by the Court."). Here, at the plea hearing, Assaye confirmed that no one had put any force or pressure on him to plead guilty and that he was fully satisfied with his defense counsel's representation of him throughout his case. [Dkt. 64 at 20:8–10, 24:4–15, 25:5–9, 40:21–41:2].

Lastly, although Assaye emphasizes that his trial counsel provided him with erroneous advice regarding whether an air gun can constitute a firearm under the federal criminal code, the Fourth Circuit has already persuasively weighed in on that issue. In resolving Assaye's direct appeal, the court explained that "[a]lthough [Assaye's trial] counsel provided [him] with some erroneous advice," that advice "was ultimately irrelevant to the final plea agreement, which was the result of several rounds of negotiation." [Dkt. 66]. Accordingly, even if that advice constituted deficient performance, Assaye has not shown any resulting prejudice and therefore is not entitled to relief. See Rodriguez, 842 F.3d at 346.

III.

For the reasons stated above, Assaye's Motion to Vacate will be dismissed by an Order to be issued with this Memorandum Opinion.

Entered this 3ʳᵈ day of June, 2020.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge